UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| RICHARD HUGHES, Derivatively on Behalf of Tupperware Brands Corporation, | Civil Action No. |
| Plaintiff, | |
| v. | |
| PATRICIA A. STITZEL, CHRISTOPHER D. O'LEARY, MICHAEL S. POTESHMAN, CASSANDRA E. HARRIS, SUSAN M. CAMERON, CATHERINE A. BERTINI, KRISS CLONINGER III, MEG G. CROFTON, ANGEL R. MARTINEZ, RICHARD T. RILEY, JOYCE M. ROCHÉ, M. ANNE SZOSTAK, E.V. (RICK) GOINGS, ANTONIO MONTEIRO DE CASTRO, AND DAVID R. PARKER, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** **JURY TRIAL DEMANDED** |
| Defendants, | |
| and | |
| TUPPERWARE BRANDS CORPORATION, a Delaware Corporation, | |
| Nominal Defendant. | |

## I.    INTRODUCTION

1.    This is a stockholder derivative action brought on behalf of and for the benefit of Tupperware, against certain of its current and former officers and directors, seeking to remedy their breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and

violations of the federal securities laws.  Defendants' actions have caused substantial financial and reputational harm to Tupperware.

2.    Tupperware is a global direct seller of premium-priced kitchen and home products, and a line of beauty and personal care products.

3.    In December 2005, Tupperware greatly expanded its non-core beauty business by acquiring Sara Lee Corporation's direct-selling cosmetics, skin-care, and fragrance unit for $557 million.  The Sara Lee unit had annual sales of $470 million via various brands, including House of Fuller, Avroy Shlain, House of Sara Lee, NaturCare, Swissguarde, and Nuvo Cosmeticos.

4.    Continued growth from the Company's expanded beauty business, however, never materialized.  Instead, its year-over-year beauty product sales experienced a steady decline.  For example, while worldwide sales of Tupperware's beauty and personal care products totaled $428.8 million in 2015, they dropped to just $368.5 million in 2016.  The Company's Beauty North America segment, which consisted of cosmetics, skin care, and personal care products marketed under (i) the Beauticontrol® brand in the United States, Canada, and Puerto Rico, and (ii) the Fuller Cosmetics® brand in Mexico and Central America (*i.e.*, "Fuller Mexico"), went from $240 million in sales in 2015 to $190 million in sales in 2016.

5.    Mounting losses caused the Company to announce, in July 2017, that it would wind down its Beauticontrol business at an estimated cost of $20 million.

6.    Although Tupperware warned in early 2018 that it might need to write down part of its Fuller Mexico beauty business, by the beginning of 2019 it reversed course and

claimed that "there is no significant foreseeable risk of failing a future goodwill impairment test." This was not true and was just one of many misrepresentations made by or on behalf of the Company.

7.      Beginning on January 30, 2019, Defendants caused or otherwise allowed the Company to mislead investors by misstating or failing to disclose, among other things: (i) the true risk of further impairment of its Fuller Mexico business; (ii) that Fuller Mexico was experiencing rapidly increasing collections and sales returns, which would require increased inventory and accounts receivable reserves; (iii) that the financial performance of its units selling Fuller Mexico products was trending precipitously downward thereby requiring a significant write down of Fuller Mexico goodwill and its trade name; (iv) that because there were undisclosed accounting irregularities relating to Fuller Mexico, Tupperware would need to investigate and would therefore be unlikely to timely file one or more of its financial reports with the SEC; and (v) for these reasons and others, Tupperware's financial guidance was overstated and was not supported by a reasonable basis in fact. Moreover, by failing to timely take appropriate write offs related to Fuller Mexico, the Company was able to avoid violating the financial covenants in its $650 million Credit Agreement with lenders, which was supported by collateral including Tupperware trademarks and service marks.

8.      Tupperware also failed to disclose that it lacked the internal controls and procedures necessary to properly evaluate the impairment of Fuller Mexico, to set appropriate inventory and accounts receivable reserves, to uncover and address accounting irregularities, and to assure that the Company's public disclosures are not materially misleading.

9.     When the foregoing information belatedly made its way into the market, the Company's share price dropped, causing it to lose approximately $440 million in market capitalization.

10.     As a direct result of Defendants' unlawful course of conduct, the Company misled the investing public about its business, operations, and growth prospects. Consequently, Tupperware is now the subject of the class action for violations of the federal securities laws.

11.     The Defendants named in this Complaint face liability to the Company for their misconduct, including, among other things: (a) failing to maintain an adequate system of oversight, accounting controls and procedures, disclosure controls, and other internal controls, which were necessary to prevent or promptly correct the improper statements made on the Company's behalf; (b) affirmatively making, allowing to be made, and/or failing to correct improper statements in Company press releases, SEC filings, and other public statements relating to, among other things, Tupperware's Fuller Mexico division, as well as the Company's overall business, operations, and prospects; and (c) failing to ensure the Company's compliance with relevant legal and regulatory requirements, including but not limited to requirements imposed under state and federal securities laws.

12.     Due to the Tupperware's Board of Directors' (the "Board") direct involvement in the wrongdoing, its members' lack of independence, and the substantial likelihood of liability its members face, any demand upon the Board to rectify this wrongdoing would be a wasteful and useless act.  Accordingly, Plaintiff brings this action to remedy the harm to Tupperware caused by Defendants' faithless actions.

## II.    JURISDICTION AND VENUE

13.    This Court has jurisdiction over the claims asserted herein under 28 U.S.C. § 1332 because there is complete diversity among the parties and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

14.    This Court also has jurisdiction pursuant to 28 U.S.C. § 1331 over (a) the contribution claims asserted herein under § 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), and (b) the claims asserted herein for breach fiduciary duty premised upon duties imposed and defined by the federal securities laws, rules, regulations, and federal substantive corporate law. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over all other claims that are so related to claims in this action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

15.    This Court has personal jurisdiction over each defendant because each defendant is either a corporation conducting business and maintaining operations in this District or an individual who is either present in this District for jurisdictional purposes or has, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchanges and markets, such that each defendant has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

16.    Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1391(b) because: (i) Tupperware maintains its principal place of business in this District; (ii) one or more of the Defendants resides or maintains offices in this District; (iii) a substantial portion of the

transactions and wrongs complained of herein occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## III.    PARTIES

### A.    Plaintiff

17.    Plaintiff Richard Hughes is a current stockholder of Tupperware and has continuously owned such shares since January 2018.  Hughes is a citizen of Texas.  Plaintiff will fairly and adequately represent the interests of Tupperware and its stockholders in enforcing the rights of the Company.

### B.    Nominal Defendant

18.    Nominal Defendant Tupperware operates as a direct-to-consumer marketer of various products across a range of brands and categories in Europe, Africa, the Middle East, Asia Pacific, North America, and South America.  Tupperware is a Delaware corporation with its principal executive offices located at 14901 South Orange Blossom Trail, Orlando, Florida.

19.    The Company's common stock trades on the New York Stock Exchange (NYSE) under the ticker symbol "TUP."  As of March 9, 2020, the Company had 48,931,022 shares of common stock outstanding.

### C.    Individual Defendants

20.    Defendant Patricia A. Stitzel was the Chief Executive Officer (CEO) and President of the Company from May 2018 until November 11, 2019, and Chief Operating Officer (COO) and President between October 2016 and May 2018.  Stitzel became a Board member in May 2018, and served as its Chairman between May 2019 and November 11, 2019.

Stitzel knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Tupperware's press releases, public filings, and other public statements relating to its business, operations, and growth prospects. As of March 25, 2019, Stitzel beneficially owned 82,294 shares of TUP common stock, which was worth more than $2 million. In 2019, the Company paid Stitzel total compensation of $2,689,682 (salary of $769,682, stock awards of $1,362,634, option awards of $138,077, and $419,289 in other compensation) not justified by Tupperware's actual financial performance.

21.    Defendant Christopher D. O'Leary was Interim CEO of the Company between November 12, 2019 and April 6, 2020. He also has been a member of the Board since January 25, 2019. He served on the Board's Audit Committee between January 25, 2019 and November 12, 2019 and returned to the committee effective April 6, 2020. O'Leary has been designated by the Company as meeting the requirements of an "Audit Committee Financial Expert" as defined by SEC and NYSE regulations and rules. O'Leary knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Tupperware's press releases, public filings, and other public statements relating to its business, operations, and growth prospects. On November 12, 2019, O'Leary entered into an Interim CEO employment agreement, pursuant to which he would receive an annual base salary of $1,000,000, an annual target bonus opportunity of $1,150,000, and a "sign-on" restricted stock unit award with a grant date value of $1,000,000. In 2019, the Company paid O'Leary total officer compensation of $1,117,517 (salary of $111,594, stock awards of $1,000,008, and $5,915 in other compensation) not justified by Tupperware's actual financial performance.

Additionally, for his services as a director in 2019, the Company paid O'Leary $256,415, $152,915 of which was paid in TUP stock.

22.    Defendant Michael S. Poteshman was the Chief Financial Officer (CFO) and a Vice President of the Company from November 2003 until March 31, 2019, and thereafter provided consulting services to the Company from March 31, 2019 until September 30, 2019. He is a Certified Public Accountant (CPA).  Poteshman knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Tupperware's press releases, public filings, and other public statements relating to its business, operations, and growth prospects.  As of March 25, 2019, Poteshman beneficially owned 150,522 shares of TUP common stock, which was worth more than $3.7 million.  In 2019, the Company paid Poteshman total compensation of $849,185 (salary of $147,483 stock awards of $412,539, and $289,163 in other compensation) not justified by Tupperware's actual financial performance.

23.    Defendant Cassandra E. Harris has been the CFO and an Executive Vice President of the Company since April 1, 2019.  She is a CPA and a Chartered Global Management Accountant.  Harris knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Tupperware's press releases, public filings, and other public statements relating to its business, operations, and growth prospects.  In 2019, Harris entered into an employment contract with Tupperware which provided for a starting base salary of $500,000, a sign-on cash bonus of $100,000, an annual cash incentive program target under the 2019 Annual Incentive Program of 75% of her base salary, and a special restricted stock unit award with a grant date fair value of $450,000.  In 2019, the Company paid Harris total compensation of $1,242,543 (salary and bonus of $481,309, stock awards of

$600,008, and $161,226 in other compensation) not justified by Tupperware's actual financial performance.

24.    Defendant Susan M. Cameron has served as a Board member since 2011. Cameron breached her fiduciary duties to the Company and its stockholders as described below.  Cameron also knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Tupperware's press releases, public filings, and other public statements relating to the Company's business, operations, and growth prospects.  As of March 25, 2019, Cameron beneficially owned 25,877 shares of TUP common stock, which was worth more than $638,000.  In 2019, the Company paid Cameron $287,765, $205,015 of which was paid in TUP stock.

25.    Defendant Catherine A. Bertini has served as a Board member since 2005, and a member of its Audit Committee since 2007.  Bertini will retire from the Board following the Company's 2020 Annual Meeting which will be held on May 20, 2020.  Bertini breached her fiduciary duties to the Company and its stockholders as described below.  Bertini also knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Tupperware's press releases, public filings, and other public statements relating to the Company's business, operations, and growth prospects.  As of March 25, 2019, Bertini beneficially owned 30,344 shares of TUP common stock, which was worth approximately $750,000.  In 2019, the Company paid Bertini $232,015, $130,015 of which was paid in TUP stock awards.

26.    Defendant Kriss Cloninger III has served as a Board member since 2003. Cloninger has been designated by the Company as meeting the requirements of an "Audit

Committee Financial Expert" as defined by SEC and NYSE regulations and rules. Cloninger breached his fiduciary duties to the Company and its stockholders as described below. Cloninger also knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Tupperware's press releases, public filings, and other public statements relating to the Company's business, operations, and growth prospects. As of March 25, 2019, Cloninger beneficially owned 47,373 shares of TUP common stock, which was worth more than $1.1 million. In 2019, the Company paid Cloninger $251,515, $130,015 of which was paid in TUP stock awards.

27.    Defendant Meg G. Crofton has served as a Board member since 2016. Crofton breached her fiduciary duties to the Company and its stockholders as described below. Crofton also knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Tupperware's press releases, public filings, and other public statements relating to the Company's business, operations, and growth prospects. As of March 25, 2019, Crofton beneficially owned 8,233 shares of TUP common stock, which was worth more than $200,000. In 2019, the Company paid Crofton $230,015, $130,015 of which was paid in TUP stock awards.

28.    Defendant Angel R. Martinez has served as a Board member since 1998. Martinez will retire from the Board following the Company's 2020 Annual Meeting which will be held on May 20, 2020. Martinez breached his fiduciary duties to the Company and its stockholders as described below. Martinez also knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Tupperware's press releases, public filings, and other public statements relating to the Company's business, operations, and

growth prospects.  As of March 25, 2019, Martinez beneficially owned 33,762 shares of TUP common stock, which was worth more than $833,000.  In 2019, the Company paid Martinez $230,015, $130,015 of which was paid in TUP stock awards.

29.     Defendant Richard T. Riley has served as a Board member and a member of its Audit Committee since 2015.  He has also been the Audit Committee's Chairperson since 2019.  Riley has been designated by the Company as meeting the requirements of an "Audit Committee Financial Expert" as defined by SEC and NYSE regulations and rules.  Riley breached his fiduciary duties to the Company and its stockholders as described below.  Riley also knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Tupperware's press releases, public filings, and other public statements relating to the Company's business, operations, and growth prospects.  As of March 25, 2019, Riley beneficially owned 12,756 shares of TUP common stock, which was worth more than $300,000.  In 2019, the Company paid Riley $240,015, $180,015 of which was paid in TUP stock.

30.     Defendant Joyce M. Roché has served as a Board member since 1998, and a member of its Audit Committee since 2017.  Roché will retire from the Board following the Company's 2020 Annual Meeting which will be held on May 20, 2020.  Roché breached her fiduciary duties to the Company and its stockholders as described below.  Roché also knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Tupperware's press releases, public filings, and other public statements relating to the Company's business, operations, and growth prospects. As of March 25, 2019, Roché beneficially owned 37,171 shares of TUP common stock, which was worth more than

11

$900,000.  In 2019, the Company paid Roché $238,284, $155,015 of which was paid in TUP stock.

31.     Defendant M. Anne Szostak has served as a Board member since August 2000, and a member of its Audit Committee since 2014.  Szostak has been designated by the Company as meeting the requirements of an "Audit Committee Financial Expert" as defined by SEC and NYSE regulations and rules.  Szostak breached her fiduciary duties to the Company and its stockholders as described below.  Szostak also knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Tupperware's press releases, public filings, and other public statements relating to the Company's business, operations, and growth prospects.  As of March 25, 2019, Szostak beneficially owned 33,872 shares of TUP common stock, which was worth more than $835,000.  In 2019, the Company paid Szostak $233,515, $130,015 of which was paid in TUP stock awards.

32.     Defendant E.V. (Rick) Goings served as a Board member between 1996 and February 19, 2020.  Goings became the Board's Executive Chairman in May 2018 and served through May 2019.  Between October 1997 and May 2018, Goings served as Chairman and CEO.  Goings breached his fiduciary duties to the Company and its stockholders as described below.  Goings also knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Tupperware's press releases, public filings, and other public statements relating to the Company's business, operations, and growth prospects.  As of March 25, 2019, Goings beneficially owned 1,149,531 shares of TUP common stock, which was worth more than $28.3 million.  In 2019, the Company paid Goings $115,008, $65,008 of which was paid in TUP stock awards.

33.     Defendant Antonio Monteiro de Castro served as a Board member between 2010 and May 2019.  He also served as Chair of the Audit Committee between 2015 and May 2019, and a member since 2014.  Monteiro de Castro was designated by the Company as meeting the requirements of an "Audit Committee Financial Expert" as defined by SEC and NYSE regulations and rules.  Monteiro de Castro breached his fiduciary duties to the Company and its stockholders as described below.  Monteiro de Castro also knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Tupperware's press releases, public filings, and other public statements relating to the Company's business, operations, and growth prospects.  As of March 25, 2019, Monteiro de Castro beneficially owned 28,871 shares of TUP common stock, which was worth more than $700,000.  In 2019, the Company paid Monteiro de Castro $125,000.

34.     Defendant David R. Parker served as a Board member between 1997 and May 2019.  Parker was designated by the Company as meeting the requirements of an "Audit Committee Financial Expert" as defined by SEC and NYSE regulations and rules.  Parker breached his fiduciary duties to the Company and its stockholders as described below.  Parker also knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Tupperware's press releases, public filings, and other public statements relating to the Company's business, operations, and growth prospects.  As of March 25, 2019, Parker beneficially owned 29,439 shares of TUP common stock, which was worth more than $725,000.  In 2019, the Company paid Parker $115,000.

35.     Defendants Stitzel, O'Leary, Poteshman, and Harris are collectively the "Officer Defendants."  Defendants Stitzel, O'Leary, Cameron, Bertini, Cloninger, Crofton,

Martinez, Riley, Roché, Szostak, Goings, Monteiro de Castro, and Parker are collectively the "Director Defendants."  O'Leary, Bertini, Riley, Roché, Szostak, and Monteiro de Castro are the "Audit Committee Defendants."  Together, the Officer Defendants and the Director Defendants are sometimes referred to as "Defendants."

### D.   Relevant Non-Party Board Members

36.   Non-Party Aedhmar Hynes has served as a Board member since December 16, 2019.

37.   Non-Party Miguel Fernandez has served as President, CEO and a Board member since April 6, 2020.  The Company's 2020 Proxy Statement indicates that Fernandez is not "independent" as defined by NYSE listing standards.

38.   Non-Party Richard P. Goudis has served in the corporate executive officer position of "Executive Vice Chairman of the Board" since March 12, 2020.  The Company's 2020 Proxy Statement indicates that Goudis is not "independent" as defined by NYSE listing standards.

39.   Non-Party Mauro Schnaidman has served as a member of the Board since March 23, 2020.

## IV.   DEFENDANTS' MISCONDUCT

### A.   The Company's Beauty Products Business

40.   Tupperware is a direct seller of consumer products for the home and personal use through an independent sales force of approximately 3.2 million.  The Company's products are sold in the United States and in almost 100 foreign countries under six brands: Tupperware, Fuller, Avroy Shlain, NaturCare, Nutrimetics, and Nuvo.  Businesses operating in what the

Company classifies as emerging markets accounted for 67% of total sales in 2018, with the remainder from Western Europe, Australia, Canada, Japan, New Zealand, and the U.S.

41.    Tupperware, which historically is associated with storage products, is also in beauty business.  In 2000, under the leadership of Defendant Rick Goings, the Company paid $60 million to acquire BeautiControl, Inc., a direct seller of beauty and nutritional products. Then, in December 2005, Tupperware acquired Sara Lee Corporation's direct-selling cosmetics, skin-care, and fragrance unit for $557 million.  Also, in December 2005, Tupperware Corporation officially changed its name to the current "Tupperware Brands Corporation."

42.    Growth of the Company's beauty business, however, never materialized as planned.  In fact, the opposite occurred, as year-over-year beauty product sales experienced a steady decline.  For instance, worldwide sales of Tupperware's beauty and personal care products went from $428.8 million in 2015 to just $368.5 million in 2016.  The Company's Beauty North America segment, which consisted of cosmetics, skin care, and personal care products marketed under (i) the Beauticontrol® brand in the United States, Canada and Puerto Rico, and (ii) the Fuller Cosmetics® brand in Mexico and Central America (*i.e.*, Fuller Mexico), fell from $240 million in sales in 2015 to $190 million in sales in 2016.

43.    In Q2 2017, the Company disclosed that the sales, profitability, and cash flow of its Fuller Mexico division had fallen below its recent trend lines and was expected to fall significantly short of previous expectations for the year.  As a result, the Company performed an interim impairment test as of the end of May 2017, recording a goodwill impairment charge of $62.9 million.  The remaining goodwill balance at Fuller Mexico was $17.4 million.

44.    Then, in July 2017, the Company announced that it would wind down its Beauticontrol business. In a July 20, 2017 Form 8-K filing with the SEC, the Company stated:

> Tupperware Brands Corporation . . . announced today that, after being unable to find a buyer for its Beauticontrol unit, it will wind down that business over approximately the next 60 to 90 days. Beauticontrol's full year 2016 sales were $46.4 million and its operating loss was $9.4 million, of which $25.0 million and $5.3 million, respectively, was in the first half of the year. The unit's first half 2017 sales were $18.6 million and its operating loss was $2.6 million. The Company estimates that the net cost of executing the wind down will be $20.0 million, of which about half will be in cash. A portion of the net cost will be recorded in second quarter 2017 results.

45.    Effective Q4 2017, in connection with the closure of its Beauticontrol business, the Company further changed its segment reporting. The change was to combine its previous Beauty North America and Tupperware North America segments into one North America segment.

46.    In the Company's Form 10-K for the year ended December 30, 2017, filed on February 27, 2018, the Company warned of additional goodwill write downs at Fuller Mexico:

> The estimated fair value of the Fuller Mexico reporting unit equaled its carrying value as of May 2017 in light of the impairment charge recorded. Having the carrying value equal to fair value results in an elevated risk of additional future impairment, Fuller Mexico continued to carry a total sales force size and field manager deficit as of the end of December 2017, despite new programs aimed at higher rates of sales force additions and retention and increased activity.
>
> *    *    *
>
> Other than for the Fuller Mexico reporting unit, management has concluded there is no significant foreseeable risk of failing a future goodwill impairment test, nor is there significant foreseeable risk of the fair value of the indefinite-lived intangible assets falling materially below their respective carrying values.

47.    Thereafter, worldwide sales of Tupperware's beauty and personal care products continued on their downward spiral, dropping from $331.7 million in 2017 to $291.7 million

in 2018.  As a result, Fuller Mexico continued to be a drag on the North American segment's sales and profits.

**B.    Defendants Made or Allowed Improper Public Statements**

48.    Beginning in January 2019 at the latest, Defendants made or allowed to be made, and failed to correct, untrue statements of a material fact and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.  Such statements and omissions were made in violation of § 10(b) of the Exchange Act and Rule 10b-5.

49.    Specifically, between January 30, 2019 and February 24, 2020, Defendants failed to disclose to investors that, among other things:

(a)    the risk of further impairment to Fuller Mexico had not subsided;

(b)    Fuller Mexico was experiencing rapidly increasing collections and sales returns, which would require increased inventory and accounts receivable reserves;

(c)    the financial performance of the units selling Fuller products was trending precipitously downward thereby requiring a significant write down of Fuller Mexico goodwill and its trade name;

(d)    Tupperware's financial guidance was overstated and was not supported by a reasonable basis in fact;

(e)    because there were accounting irregularities relating to the Company's Fuller Mexico business, it would need to undertake an investigation and

would therefore be unlikely to timely file one or more of its financial reports with the SEC;

(f)     Tupperware lacked the internal controls and procedures necessary to properly evaluate the impairment of Fuller Mexico, to set appropriate inventory and accounts receivable reserves, to uncover and address accounting irregularities, and to assure that the Company's public disclosures are not materially misleading;

(g)     Tupperware would require relief from its $650 million Credit Agreement because, among other things, it was only in compliance with its financial covenants due to its failure to timely record appropriate impairments and reserves; and

(h)     as a result of the above, Defendants' public statements were materially false and/or misleading at all relevant times.

50.     On January 30, 2019, Tupperware made the first in a series of false and misleading statements to the market.   The Company issued a press release entitled "Tupperware Brands Reports Fourth Quarter 2018 Results," which included "Fourth Quarter Business Highlights" that: "Fuller Mexico sales were down 13% (9% local currency) from a lower active sales force."   The Company also provided 2019 outlook of $3.86 to $4.01 per share GAAP (Generally Accepted Accounting Principles) EPS compared to $3.11 from full-year 2018.

51.     Later, on January 30, 2019, Tupperware held its Q4 2018 earnings call.  The call was attended by Stitzel and Poteshman.  In describing the Company's 2019 financial

guidance, the Company included a slide in its presentation repeating the estimates from the press release.  During the call, in describing Tupperware's Fuller Mexico business, Stitzel suggested that it had finally turned the corner.  She stated:

> *Both of our businesses in Mexico were steady in the fourth quarter in spite of some strong political and economic headwinds. Fuller Mexico experienced low single-digit sales growth for the full year for the first time in 8 years. . . . Both of our Mexican businesses, Fuller and Tupperware, showed improvement in their sales force size comparison since the third quarter, and this is a good indicator for future results.*

> That said, we are watching closely the situation in Mexico related to a disruption in the gasoline supply by the government, and we are seeing some impact on our sales forces' mobility. So we are continuing to monitor the situation closely and react as we can.[1]

52.     On February 26, 2019, Tupperware filed a Form 10-K for its fiscal year ended December 29, 2018 with the SEC, which provided the Company's financial results and was signed by Defendants Stitzel, Poteshman, Goings, Bertini, Cameron, Cloninger, Crofton, Martinez, Monteiro de Castro, O'Leary, Parker, Riley, Roché, and Szostak.

53.     In the Form 10-K, the Company described the earlier Q2 2017 write down of Fuller Mexico and claimed that a risk of a further impairment and write down had been "significantly reduced."   It concluded:***Management has concluded there is no significant foreseeable risk of failing a future goodwill impairment test, nor is there significant foreseeable risk of the fair value of the indefinite-lived intangible assets falling materially below their respective carrying values***.

54.     Regarding the Company's internal controls, the Form 10-K stated:

**Evaluation of Disclosure Controls and Procedures**

---

[1] Emphasis is added unless otherwise noted.

The Company maintains disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15(d)-15(e)) that are designed to ensure that information required to be disclosed in the Company's reports filed or submitted under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms, and that such information is accumulated and communicated to the Company's management, including the Chief Executive Officer and the Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure. In designing and evaluating the disclosure controls and procedures, management recognized that controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives.

As of the end of the period covered by this report, management, under the supervision of the Company's Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of the design and operation of the Company's disclosure controls and procedures. Based upon that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the disclosure controls and procedures were effective as of December 29, 2018.

**Management's Report on Internal Control Over Financial Reporting**

The Company's management is also responsible for establishing and maintaining adequate internal control over financial reporting as defined in Exchange Act Rule 13a-15(f). As of the end of the period covered by this report, management, under the supervision of the Company's Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of the Company's internal control over financial reporting based on the framework in Internal Control-Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based upon that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the Company's internal control over financial reporting was effective as of the end of the period covered by this report. The effectiveness of the Company's internal control over financial reporting as of December 29, 2018 has been audited by PricewaterhouseCoopers LLP, an independent registered certified public accounting firm, as stated in its report which is included herein.

**Changes in Internal Controls**

There have been no significant changes in the Company's internal control over financial reporting during the Company's fourth quarter that have materially affected or are reasonably likely to materially affect its internal control over financial reporting, as defined in Rule 13a-15(f) promulgated under the Securities Exchange Act of 1934, as amended.

(Underline emphasis added).

55.     The February 26, 2019 Form 10-K also contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Stitzel and Poteshman attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

56.     The above statements identified in ¶¶ 50-55 were materially false and/or misleading, and failed to disclose material adverse facts, for the reasons set forth at ¶ 49(a)-(f), (h).

57.     On April 24, 2019, the Company issued a press release entitled "Tupperware Brands Reports First Quarter 2019 Results," which included "First Quarter Business Highlights" that:

> Tupperware Mexico sales were down 3% (1% local currency), due to strong productivity, partially offset by lower average active sellers. Fuller Mexico sales were down 14% (11% local currency) from a lower active sales force. Both units were impacted by a gasoline shortage during the beginning of the quarter, and uncertainty associated with the new government.

58.     In the press release, the Company also provided slightly reduced 2019 outlook of $3.65 to $3.76 GAAP EPS compared to $3.11 from full-year 2018.

59.     On May 2, 2019, Tupperware filed a Form 10-Q for the quarterly period ended March 30, 2019 with the SEC, which was signed by Defendant Harris and provided the Company's financial results.  In the Q1 Form 10-Q, the Company described reasons for its slightly increased net income as follows:

> Net income increased $1.2 million in the first quarter of 2019 compared with 2018, which included a $5.4 million negative impact on the comparison from changes in foreign currency exchange rates. The increase primarily reflected $3.3 million lower pre-tax re-engineering costs in connection with the

Company's restructuring plan announced in July 2017, lower corporate costs and lower income tax expense versus 2018. These were partially offset by lower segment profit, less efficient promotional spending, higher fixed costs in Argentina and Brazil, increased bad debt expense in Brazil and Fuller Mexico and increased commission expense in Brazil.

60.    The Q1 Form 10-Q contained signed certifications pursuant to SOX by Defendants Stitzel and Harris attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

61.    The Q1 2019 Form 10-Q stated the following regarding the Company's internal controls:

### Evaluation of Disclosure Controls and Procedures

The Company maintains disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15(d)-15(e)) that are designed to ensure that information required to be disclosed in the Company's reports filed or submitted under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms, and that such information is accumulated and communicated to the Company's management, including the Chief Executive Officer and the Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure. In designing and evaluating the disclosure controls and procedures, management recognized that controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives.

As of the end of the period covered by this report, management, under the supervision of the Company's Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of the design and operation of the Company's disclosure controls and procedures. Based upon that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the design and operation of the disclosure controls and procedures were effective.

### Changes in Internal Controls

There have been no significant changes in the Company's internal control over financial reporting during the Company's first quarter that have materially affected or are reasonably likely to materially affect its internal control over

financial reporting, as defined in Rule 13a-15(f) promulgated under the
Securities Exchange Act of 1934, as amended.

(Underline emphasis added).

    62.    The Q1 2019 Form 10-Q stated the following, in pertinent part, regarding the

Company's Credit Agreement:

> On March 29, 2019 , the Company amended and restated its multicurrency
> Credit Agreement (the "Credit Agreement") that also includes its wholly owned
> subsidiaries Tupperware Nederland B.V., Administradora Dart, S. de R.L. de
> C.V., and Tupperware Brands Asia Pacific Pte. Ltd. (the "Subsidiary
> Borrowers") with JPMorgan Chase Bank, N.A. as administrative agent (the
> "Administrative Agent"), swingline lender, joint lead arranger and joint
> bookrunner, and Credit Agricole Corporate and Investment Bank, HSBC
> Securities (USA) Inc., Mizuho Bank, Ltd. and Wells Fargo Securities, LLC, as
> syndication agents, joint lead arrangers and joint bookrunners.  The Credit
> Agreement replaces the Credit Agreement dated September 11, 2013 and as
> amended (the "Old Credit Agreement") and, other than an increased aggregate
> amount that may be borrowed, an improvement in the consolidated leverage
> ratio covenant and a slightly more favorable commitment fee rate, has terms
> and conditions similar to that of the Old Credit Agreement.  The Credit
> Agreement makes available to the Company and the Subsidiary Borrowers a
> committed five-year credit facility in an aggregate amount of $650 million (the
> "Facility Amount").

*     *     *

> ***Under the Credit Agreement and consistent with the Old Credit Agreement,
> the Guarantor unconditionally guarantees all obligations and liabilities of the
> Company and the Subsidiary Borrowers relating to the Credit Agreement,
> supported by a security interest in certain "Tupperware" trademarks and
> service marks.  The Credit Agreement includes a trigger whereby the
> Corporation would be required to provide additional collateral and subsidiary
> guarantees if either Moody's Investors Services, Inc. or S&P Global Ratings
> downgrades its existing ratings by two or more rating levels.***

> ***As of March 30, 2019, and currently, the Company had considerable cushion
> under its financial covenants.  However, economic conditions, adverse
> changes in foreign exchange rates, lower than foreseen sales, profit and/or
> cash flow generation, including from restructuring actions, the payment of
> dividends, the ability to access cash generated internationally, share
> repurchases or the occurrence of other events discussed under "Forward
> Looking Statements" in this Part I, Item 3 and in the Company's other reports***

*filed with the SEC could impact the Company's ability to comply with these covenants*.

63.     The above statements identified in ¶¶ 57-62 were materially false and/or misleading, and failed to disclose material adverse facts, for the reasons set forth at ¶ 49(a)-(h).

64.     On July 24, 2019, the Company issued a press release entitled "Tupperware Brands Reports Second Quarter 2019 Results," which reported "[n]et income of $39.4 million or $0.81 diluted per share compared with $63.8 million and $1.26 diluted per share last year." In the release, Tupperware provided updated full-year 2019 guidance of $2.94 to $3.09 GAAP EPS compared to $3.11 from full-year 2018.

65.     On August 1, 2019, Tupperware filed a Form 10-Q for the quarterly period ended June 29, 2019 with the SEC, which provided the Company's financial results and position.  The Q2 2019 Form 10-Q was signed by Defendant Harris.  In describing the quarterly decrease in sales in the North America segment, the Company stated:

> Emerging markets accounted for $75.3 million and $79.6 million, or 60 percent and 58 percent of the reported sales in the segment in the second quarters of 2019 and 2018, respectively. On a local currency basis, the emerging market units' sales decreased 7 percent, primarily reflecting a less active and less productive sales force in Fuller Mexico. Both Fuller Mexico and Tupperware Mexico results were negatively impacted by lower consumer spending mainly resulting from economic uncertainty associated with new government actions.

66.     The Q2 2019 Form 10-Q contained signed certifications pursuant to SOX by Defendants Stitzel and Harris attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

67.    The Q2 2019 Form 10-Q stated the following, in pertinent part, regarding the

Company's internal controls:

### *Evaluation of Disclosure Controls and Procedures*

The Company maintains disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15(d)-15(e)) that are designed to ensure that information required to be disclosed in the Company's reports filed or submitted under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms, and that such information is accumulated and communicated to the Company's management, including the Chief Executive Officer and the Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure. In designing and evaluating the disclosure controls and procedures, management recognized that controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives.

As of the end of the period covered by this report, management, under the supervision of the Company's Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of the design and operation of the Company's disclosure controls and procedures. Based upon that evaluation, <u>the Chief Executive Officer and Chief Financial Officer concluded that the design and operation of the disclosure controls and procedures were effective</u>.

### *Changes in Internal Controls*

<u>There have been no significant changes in the Company's internal control over financial reporting during the Company's second quarter that have materially affected or are reasonably likely to materially affect its internal control over financial reporting</u>, as defined in Rule 13a-15(f) promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act").

(Underline emphasis added).

68.    The Q2 2019 Form 10-Q stated the following regarding the Company's

continuing compliance with its Credit Agreement:

***As of June 29, 2019, and currently, the Company had cushion under its financial covenants***. However, economic conditions, adverse changes in foreign exchange rates, lower than foreseen sales, profit and/or cash flow generation, including from restructuring actions, the payment of dividends, the ability to access cash generated internationally, share repurchases or the

occurrence of other events discussed under "Forward Looking Statements" in this Part I, Item 3 and in the Company's other reports filed with the SEC could impact the Company's ability to comply with these covenants.

69.    The above statements identified in ¶¶ 64-68 were materially false and/or misleading, and failed to disclose material adverse facts, for the reasons set forth at ¶ 49(a)-(h).

**C.    The Truth Is Gradually Revealed While the Company Continues to Mislead**

70.    On October 30, 2019, prior to market open, the Company issued a press release entitled "Tupperware Brands Reports Third Quarter 2019 Results," providing updated full-year 2019 guidance of $1.93 to $1.99 GAAP EPS ($2.77 to $2.83 "EPS Excluding Items") compared to $3.11 from full-year 2018.  The release further stated in pertinent part:

"Sales for the third quarter ended in line with our forecasted guidance as the challenging trends we've been experiencing in Brazil, China, and US & Canada persisted as we expected." said Tricia Stitzel, Chairman and Chief Executive Officer of Tupperware Brands. "***Profitability was adversely affected by accounting reserves related to our Fuller Mexico beauty business and adjustments to our tax provision***. We are moving forward with great urgency to prioritize opportunities in how we go to market, cost structure, and cash flow management to drive near-term results so we can navigate the current landscape successfully without sacrificing our long-term objectives for our business. We remain committed to ensuring Tupperware remains competitive - both today and for the long term - while delivering sustainable shareholder value."

\*      \*      \*

***Tupperware Brands Corporation's financial results for the fiscal 2019 third quarter included increased reserves for accounts receivable and inventory in its Fuller Mexico beauty business as a result of lower collections and higher sales returns***. These increased reserves negatively impacted Adjusted E.P.S. by $0.13 versus the previously stated guidance. ***Given the trends in the Fuller Mexico beauty business, an impairment assessment was performed on the recorded goodwill balance resulting in a pre-tax, non-cash goodwill***

> ***impairment charge of the remaining balance of $17.5 million or $0.36 on GAAP E.P.S.***

71.     On October 30, 2019, Tupperware held its Q3 2019 earnings call.  The call was attended by Stitzel and Harris.  During the call, in describing Tupperware's Fuller Mexico business and the Company's guidance, Harris stated as follows:

> Our pretax return on sales guidance of 10% did not anticipate a noncash item related to our Fuller Mexico business. ***The Fuller Mexico beauty business had lower collections and higher sales returns than expected, resulting in increased inventory and accounts receivable reserves, impacting earnings per share by $0.13 versus our guidance. The beauty business in Mexico operates quite differently from our Tupperware businesses.*** We will consider all strategic actions related to the beauty businesses as we continue to focus on revitalizing the core and streamlining our business.
>
> \*       \*       \*
>
> Turning now to full year guidance. Given the trends in our largest markets, our full year local currency sales decline is now expected to be down 8% to 10% and earnings per share is expected to be between $2.77 and $2.83 ["EPS Excluding Items"], ***primarily due to lower profit on declining sales.*** This forecast also includes $0.10 worse impact for foreign exchange than the guidance in July. ***Additionally, the Fuller beauty item is expected to have an overall $0.16 negative impact***, while the tax provision change is expected to be $0.18 worse than July guidance for the full year.

72.     On this news, shares of Tupperware stock fell from $15.54 per share on October 29, 2019 to close at $10.16 per share the next day.  This 35% drop destroyed more than $263 million in market capitalization.

73.     Despite the belated increase of reserves for accounts receivable and inventory in Fuller Mexico, the above statements identified in ¶¶ 70-71 were still materially false and/or misleading, and failed to disclose material adverse facts, for the reasons set forth at ¶ 49(a)-(h).

74.     On November 6, 2019, Tupperware filed a Form 10-Q for the quarterly period ended September 28, 2019 with the SEC, which provided the Company's financial results and position.  The Q3 2019 Form 10-Q was signed by Defendant Harris.  In describing its write off of goodwill associated with Fuller Mexico, the Company stated:

> The Company's goodwill and intangible assets relate primarily to the December 2005 acquisition of the direct-to-consumer businesses of Sara Lee Corporation. ***In the third quarters of 2019 and 2018, the Company completed the annual assessments for all of its reporting units and indefinite-lived intangible assets, concluding $19.7 million of impairment existed as of the third quarter 2019, mainly for the impairment of goodwill associated with the Fuller Mexico beauty and personal care products business in the amount of $17.5 million.*** The Nutrimetics tradename was also impaired by $2.2 million due to declining sales trends, leaving a $3.5 million carrying value as of September 28, 2019. There were no impairments in 2018.

75.     The Q3 2019 Form 10-Q contained signed certifications pursuant to SOX by Defendants Stitzel and Harris attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

76.     The Q3 2019 Form 10-Q stated the following regarding the Company's internal controls:

> ***Evaluation of Disclosure Controls and Procedures***
>
> The Company maintains disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15(d)-15(e)) that are designed to ensure that information required to be disclosed in the Company's reports filed or submitted under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms, and that such information is accumulated and communicated to the Company's management, including the Chief Executive Officer and the Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.  In designing and evaluating the disclosure controls and procedures, management recognized that controls and procedures, no matter how well designed and operated, can provide only reasonable

assurance of achieving the desired control objectives.  Further, because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that misstatements due to error or fraud will not occur or that all control issues and instances of fraud, if any, within the company will be detected.

As of the end of the period covered by this report, management, under the supervision of the Company's Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of the design and operation of the Company's disclosure controls and procedures.  Based upon that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the design and operation of the disclosure controls and procedures were effective.

### Changes in Internal Controls

There have been no significant changes in the Company's internal control over financial reporting during the Company's third quarter that have materially affected or are reasonably likely to materially affect its internal control over financial reporting, as defined in Rule 13a-15(f) promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act").

(Underline emphasis added).

77.     The Q3 2019 Form 10-Q stated the following, in relevant part, regarding the

Company's continuing compliance with its Credit Agreement:

*The financial covenants provide for a maximum Consolidated Leverage Ratio of 3.75 to 1.0 and a minimum interest coverage ratio of 3.0 to 1.0 (defined as consolidated EBITDA divided by consolidated total interest expense)*. For purposes of the Credit Agreement, consolidated EBITDA represents earnings before interest, income taxes, depreciation and amortization, as adjusted to exclude unusual, non-recurring gains as well as non-cash charges and certain other items. *As of September 28, 2019, and currently, the Company was in compliance with the financial covenants in the Credit Agreement*.

78.     The Q3 2019 Form 10-Q stated the following with respect to "Goodwill and

Intangible Assets":

The Company's goodwill and intangible assets relate primarily to the December 2005 acquisition of the direct-to-consumer businesses of Sara Lee Corporation. In the third quarters of 2019 and 2018, the Company completed the annual assessments for all of its reporting units and indefinite-lived intangible assets, concluding $19.7 million of impairment existed as of the third quarter 2019,

mainly for the impairment of goodwill associated with the Fuller Mexico beauty and personal care products business in the amount of $17.5 million. . . .

79.    The above statements identified in ¶¶ 74-78 were materially false and/or misleading, and failed to disclose material adverse facts, for the reasons set forth at ¶¶ 49(a)-(h).

### D.    The Truth Is Revealed

80.    On February 24, 2020, the Company issued a press release entitled "Tupperware Brands Reports Preliminary 2019 Results," which announced that the Company would be unable to file its SEC Form 10-K on time.  The release stated in pertinent part:

> Tupperware Brands Corporation (the "Company") today announced select preliminary financial results for the fiscal year ended December 28, 2019. The Company also announced it will file a Form 12b-25 Notification of Late Filing with the Securities and Exchange Commission to provide a 15-calendar day extension within which to file its Form 10-K for the fiscal year ended December 28, 2019. The extension will provide the Company time to finalize additional procedures as part of its investigation regarding the impact of certain financial reporting matters in its Fuller Mexico beauty business and to finalize its tax rate, as further described below.

*    *    *

**Full-Year Preliminary Financial Updates**

- Full-year sales are expected to be in line with previously provided outlook ranges of down 12% to 14% as reported and down 8% to 10% in local currency+
- GAAP pre-tax return on sales is expected to be approximately 6%
- GAAP diluted E.P.S. is expected to be in the range of breakeven to $0.34 versus $3.11 in the prior year. The current year was negatively impacted by $40 million for the non-cash impairment of goodwill and intangible assets and $35 million of re-engineering costs
- The Fuller Mexico full-year 2019 negative impact on an adjusted* pre-tax basis is expected to be in the range of $19-21 million
- Impact of taxes on adjusted* E.P.S. is expected to be in the range of $1.66-$1.98 in 2019

- Adjusted* pre-tax return on sales is expected to be approximately 10% or 12% excluding the Fuller Mexico impact, versus 14% in the prior year
- Adjusted* diluted E.P.S. is expected to be $1.35-$1.70 versus $4.30 in the prior year, including $0.26 cents from foreign currency

The primary drivers of the decline in profit are expected to be:

- The Company increased its valuation allowances for deferred tax assets related to foreign tax credits and disallowed interest deductions due to the Company's multi-year declining domestic performance resulting in an elevated GAAP tax rate of 84% to 100% and operating tax rate of 55% to 66% for fiscal 2019.
- The Company experienced continued execution challenges and unfavorable macro-economic trends most notably in its core markets of Brazil, China, and U.S. & Canada. The impact on segment profit is expected to be approximately $83 million or $0.75 cents per share, excluding Fuller Mexico of $19-21 million.
- The Company is conducting an investigation primarily into the accounting for accounts payable and accrued liabilities at its Fuller Mexico beauty business to determine the extent to which these matters may further impact results and to assess and enhance the effectiveness of internal controls at this business. This matter is $9-11 million of the total expected $19-21 million full-year impact on an adjusted* pre-tax basis. In addition, total impairments for Fuller Mexico are expected to be approximately $31 million. The total pre-tax impact for 2019 is approximately $50- $52 million.

"While challenges in Brazil, China, and the U.S. & Canada businesses persisted in the fourth quarter in line with our expectations, our preliminary results were further affected by financial reporting issues in Fuller Mexico. We are working rapidly to address these Fuller Mexico issues in order to finalize our 2019 results. We are also focused on facing the clear headwinds in our core markets and accelerating the pace at which we can achieve meaningful improvement in the business," said Chris O'Leary, the Company's Interim CEO.

\*        \*        \*

**Debt Covenant**

Based on the 2020 outlook, the Company is forecasting a need for relief concerning its existing leverage ratio covenant in its $650 million Credit Agreement dated March 29, 2019 (the "Credit Agreement"), to avoid a potential acceleration of the debt, which could have a material adverse impact on the

<u>Company.</u> Approvals have been received, pending completion of final documentation, from participating banks to amend the maximum consolidated leverage (debt-to-EBITDA) in the Credit Agreement for the required relief. <u>In connection with the amendment, the Company and certain of its subsidiaries will provide additional collateral and subsidiary guarantees.</u>

(Underline emphasis added).

81.     On this news, shares of Tupperware stock fell $2.61 per share, or 46%, to close at $3.11 per share on February 25, 2020, wiping out more than $127 million in market capitalization.

82.     On March 2, 2020, the Company filed a Form 8-K announcing the renegotiation and amendment of its Credit Agreement with JPMorgan Chase Bank, N.A. as administrative agent, and the lenders party thereto.  The Form 8-K stated, in part:

Among other changes to the Credit Agreement, Amendment No. 2 modifies the financial covenant in the Credit Agreement that requires the Company to maintain at the end of each measurement period a specified ratio of (i) Consolidated Funded Indebtedness to (ii) Consolidated EBITDA (the "Consolidated Leverage Ratio"). Prior to Amendment No. 2, the Consolidated Leverage Ratio was not greater than or equal to 3.75 to 1.00. Following Amendment No. 2, the Company is required to maintain at the last day of each measurement period a Consolidated Leverage Ratio not greater than or equal to the ratio as set forth below opposite the period that includes such day (or, if such day does not end on the last day of the calendar quarter, that includes the last day of the calendar quarter that is nearest to such day).

| Period | Consolidated Leverage Ratio |
|---|---|
| From the Amendment No. 2 effective date to and including June 27, 2020 | 5.75 to 1.00 |
| September 26, 2020 | 5.25 to 1.00 |
| December 26, 2020 | 4.50 to 1.00 |
| March 27, 2021 | 4.00 to 1.00 |
| June 26, 2021 and thereafter | 3.75 to 1.00 |

Amendment No. 2 eliminates the requirement that a Non-Investment Grade Ratings Event must occur before the Company is required to cause the Additional Guarantee and Collateral Requirement to be satisfied. ***Pursuant to***

> *Amendment No. 2, the Company will now be required to cause certain of its*
> *domestic subsidiaries to become guarantors and to pledge, and to cause*
> *certain of its domestic subsidiaries to pledge, additional collateral.*

83.     On March 12, 2020, Tupperware filed a Form 10-K for its fiscal year ended December 28, 2019 with the SEC.  The Form 10-K disclosed that Tupperware's 2019 GAAP EPS came in at only $0.25 per share compared to $3.11 from full-year 2018.  GAAP EPS for Q4 2019 was a loss of ($1.47) per share.

84.     According to the Form 10-K, "[w]orldwide sales of beauty and personal care products totaled $247.7 million, $291.7 million and $331.7 million in 2019, 2018 and 2017, respectively."  With respect to the Company's sales decrease in 2019 compared to 2018, the Company said it was partially driven by "Fuller Mexico, resulting from a smaller, less active and less productive sales force."  With respect to the Company's gross margin percentage decrease in 2019 compared to 2018, it was partially driven by "higher obsolescence charges at Fuller Mexico."  Similarly, increased delivery and sales and administrative expense as a percentage of sales was due, in part, to higher bad debt expense in Fuller Mexico.  Decreased operating income was due, in part, to "decreased segment profit for North America, primarily at Fuller Mexico and in the United States and Canada" and "impairment charges related to intangible assets, mainly related to Fuller Mexico goodwill and Fuller tradename."

85.     With respect to the Company's investigation of Fuller Mexico, the Company admitted that it had uncovered troubling misconduct:

> Operational risk generally refers to the risk of loss resulting from the
> Company's operations, including those operations performed for the Company
> by third parties. This would include but is not limited to the risk of *fraud by*
> *employees or persons outside the Company, the execution of unauthorized*
> *transactions by employees or others, errors relating to transaction processing,*
> *breaches of the internal control system and compliance requirements, and*

*unplanned interruptions in service*. ___Certain of these types of activities were___ ___identified in the course of the Company's review of the Fuller Mexico___ ___business___.

86.    The Company also described its Q4 2019 impairment of the Fuller trade name,

stating as follows:

> In the fourth quarter of 2019, as part of the on-going assessment of goodwill and intangible assets, the Company noted that the financial performance of the units selling Fuller products had fallen below their previous trend lines and it concluded that they would fall significantly short of previous expectations. Revenue further declined in the fourth quarter of 2019 and margins significantly declined from third to fourth quarter resulting in an approximate 30 percent decrease in margins in the forecasted period. This significant impact to margins also impacted the royalty rate which was reduced from the rate utilized in the third quarter of 2019. These declines in the financial performance were deemed to be a triggering event and a test for recoverability and impairment was performed over the definite-lived intangible asset which included comparing the sum of the estimated undiscounted future cash flows, based on the relief from royalty method, attributable to the Fuller tradename to its carrying value. ***The result of the impairment test was to record a $20.3 million impairment to the Fuller tradename in the fourth quarter of 2019 recorded in "Impairment of goodwill and intangible assets" of the Consolidated Statements of Income.*** As the units that sell Fuller products are in different geographical areas, impairments of $6.0 million, $13.6 million and $0.7 million were recorded for the Asia Pacific, North America and South America segments, respectively, leaving a $6.5 million carrying value as of December 28, 2019.

87.    The Company further described the effect of the Q4 2019 impairment of the

Fuller trade name on its deferred tax assets as follows:

> The Company also booked a valuation allowance of $18.4 million in the fourth quarter of 2019 against the net tax assets for Fuller Mexico. The Company noted that the financial performance of Fuller had fallen below their previous trend lines and it concluded that they would fall significantly short of forecasted expectations. Revenue and profitability further declined in the fourth quarter of 2019. These declines in the financial performance triggered a reassessment of the realizability of the deferred tax assets in the fourth quarter resulting in a full valuation of $18.4 million being taken against the Fuller net deferred tax assets.

88.     On this news, over the course of the next two trading days, Tupperware shares fell from $2.27 per share to close at $1.25 per share on Monday, March 16, 2020, a drop of 45%.  This further drop erased another $49.9 million in market capitalization.

## V.    DAMAGES/HARM TO TUPPERWARE

89.     As a direct and proximate result of Defendants' misconduct, Tupperware has suffered and continues to suffer significant harm, including but not limited to:

A.     The payment of cash and incentive compensation to the Defendants in amounts not justified by the Company's actual financial performance while under their stewardship, and further unjustified in light of defendants' misrepresentations and omissions detailed above.

B.     The loss of credibility associated with Tupperware's dissemination of improper public statements concerning its business, operations, and prospects, and the Company's associated loss of approximately $440 million in market capitalization as the misconduct came to light;

C.     Costs associated with renegotiating, amending, and abiding by the revised terms of Tupperware's Credit Agreement;

D.     Harm to Tupperware's corporate image and goodwill.  For the foreseeable future, the Company will suffer from what is known as the "liar's discount," a term applied to the stock of companies which have been implicated in misleading the investing public, such that Tupperware's ability to raise equity capital or debt on favorable terms in the future is now and will continue to be impaired.  The Company

will incur higher marginal costs of capital and debt because of the misconduct; and

E.    Costs incurred from compensation and benefits paid to Defendants and other members of Tupperware's management while they were engaged in the improper conduct alleged herein, which compensation was based in part on the Company's artificially inflated stock price.

## VI.    DEFENDANTS' DUTIES

### A.    Defendants' Fiduciary Duties

90.    By reason of their positions as officers and/or directors of Tupperware and because of their responsibility to control the business and corporate affairs of the Company, Defendants owed, and owe, the Company and its stockholders the fiduciary obligations of good faith, loyalty, due care, and candor and were, and are, required to use their utmost ability to control and manage the Company in a just, honest, fair, and equitable manner. Each Defendant owed, and owes, the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company, as well as the highest obligations of fair dealing and not to act in furtherance of his or her personal interest or benefit.

91.    Because of their positions of control and authority as officers and/or directors of Tupperware, Defendants were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with Tupperware, each Defendant had knowledge of material, nonpublic information regarding the Company. In addition, as officers and/or directors of a publicly-held company, Defendants had a duty to promptly disseminate accurate and truthful

information with regard to the Company's business, operations, and prospects so that the market price of the Company's stock would be based on truthful and accurate information.

92.    At all times relevant hereto, each Defendant was the agent of each of the other Defendants and of Tupperware and was at all relevant times acting within the course and scope of such agency.

93.    To discharge their duties, Defendants were, and are, required to exercise reasonable and prudent oversight and supervision over the management, policies, practices, and controls of Tupperware.  By virtue of such duties, Defendants were, and are, required to, among other things:

   a.    exercise good faith to ensure that the Company is operated in a diligent, efficient, honest, and prudent manner and in accordance with all applicable laws (including federal and state laws, government rules and regulations, and the Company's Certificate of Incorporation and Bylaws);

   b.    neither violate nor knowingly permit any officer, director, or employee of Tupperware to violate any applicable laws, rules, or regulations;

   c.    remain informed as to the status of Tupperware's operations, and upon receipt or notice of information of imprudent or unsound practices, to make a reasonable inquiry in connection thereto and to take steps to correct such conditions or practices;

   d.    establish and maintain systematic and accurate records and reports of the business and affairs of Tupperware and procedures for the reporting

of the Company's business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

e.      maintain and implement an adequate, functioning system of internal controls, such that the affairs and operations of Tupperware are conducted in accordance with all applicable laws, rules, and regulations; and

f.      truthfully and accurately inform and guide investors and analysts with respect to the business operations of the Company.

**B.      Duties Pursuant to the Company's Corporate Governance Principles**

94.      The Company's Corporate Governance Principles ("Governance Principles") were adopted by the Board to, along with the Certificate of Incorporation, Bylaws, and Board Committee Charters, form the framework for governance of the Company.  These guidelines apply to the Director Defendants in connection with their membership on Tupperware's Board.

95.      According to Tupperware's Governance Principles, the Board's role is:

to oversee the affairs of the Corporation for the benefit of its shareholders, which are managed on a day-to-day basis by management. Areas of emphasis by the Board of Directors are corporate strategy; selection, performance, succession and compensation of senior management; effectiveness of control and compliance systems; and assessment of financial and operational risks to the Corporation and management's responses thereto. These areas are separate and apart from the legal duties as may exist under the Delaware General Corporation Law, including the fiduciary duties of care and loyalty.

**C.      Duties Pursuant to the Company's Code of Conduct**

96.      Defendants were also bound by the Company's Code of Conduct, which applies to all Tupperware Associates, including directors, officers, and employees.

97.    Among other things, the Code states that "Associates must comply with all laws and government regulations applicable to the conduct of our business."

98.    With respect to accounting and auditing, it states that: "We expect Associates having control over [accounting and auditing policies and procedures] to handle them with the strictest integrity, to ensure that we execute each transaction in accordance with management's authorization, and to properly and accurately record it in our accounting records."

**D.    Additional Duties of the Audit Committee Defendants**

99.    In addition to the duties discussed above, the Audit Committee Defendants owed specific duties to Tupperware under the Audit, Finance and Corporate Responsibility Committee Charter ("Audit Charter").  According to the Audit Charter, the Audit Committee's purpose is as follows:

> The purposes of the Audit, Finance and Corporate Responsibility Committee (the "Committee") of the Board of Directors of Tupperware Brands Corporation (the "Corporation") shall be (1) to assist the Board of Directors in discharging its responsibilities relating to the oversight of the establishment, maintenance and monitoring of controls over the Corporation's financial policies, financial statements and disclosure responsibilities (including required reporting) in order to assure the integrity of the Company's financial statements; (2) selection, management, evaluation, compensation and replacement of independent auditors to the Corporation; (3) evaluation of the performance of the Corporation's internal audit function and its auditors; (4) oversight of the Corporation's compliance generally with laws and regulations, including compliance programs; and (5) oversight of the Corporation's financial structure.

100.    Among other things, the Audit Charter charges the Audit Committee Defendants with the following authority and responsibilities for risk assessment and management:

> The Committee shall discuss (a) the Corporation's guidelines and policies regarding the governance by which risk assessment and management is

undertaken by the Corporation's management, and (b) the Corporation's major financial and operational risk exposures and the steps management has taken to monitor and control such exposures.

101.    The Audit Charter charges the Audit Committee Defendants with the following authority and responsibilities for the Company's financial statements, policies, disclosures, releases, and guidance:

(1) review and discuss with management and the independent auditor the Corporation's annual and quarterly financial statements, including the specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" and determine whether or not to recommend to the board of directors that such materials be included in the Corporation's annual report on Form 10-K;

(2) discuss with management and the independent auditor significant financial reporting issues and adjustments made in connection with the Corporation's financials statements, including changes in accounting principles;

(3) review and discuss with management and the independent auditor any major issues as to the adequacy of the Corporation's internal controls, any special steps adopted in light of material control deficiencies and the adequacy of disclosures about changes in internal control over financial reporting;

(4) review and discuss with management and the independent auditor the Corporation's internal controls report and the independent auditor's attestation of the report prior to the filing of the Corporation's Form 10-K;

(5) review and discuss quarterly reports from the independent auditors regarding critical account policies and practices, alternative treatments of financial information under generally accepted accounting principles that have been discussed with management and the ramifications of the uses thereof, and other material written communications between management and the independent auditor;

(6) discuss with management and the independent auditor the effect of regulatory and accounting initiatives as well as off-balance sheet structures, if any, on the Corporation's financial statements;

(7) review disclosures made to the Committee concerning internal controls (including significant deficiencies and/or material weaknesses) in connection with the certification process or fraud relating to the Corporation's filings with the Securities and Exchange Commission; and

(8) discuss the Corporation's earnings releases and information and guidance provided to analysts and ratings agencies, though such discussions may be general and need not be in advance of releases or guidance.

## VII.    CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

102.    In committing the wrongful acts alleged herein, Defendants have pursued, or joined in the pursuit of, a common course of conduct and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct alleged herein giving rise to primary liability, Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

103.    During all times relevant hereto, Defendants, collectively and individually, initiated a course of conduct that was designed to and did, among other things: (a) deceive the investing public including stockholders of Tupperware; and (b) permit flawed and ineffectual internal controls over the Company's operations.  In furtherance of this plan, conspiracy, and course of conduct, Defendants, collectively and individually, took the actions set forth herein.

104.    Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, Defendants caused and/or allowed the improper conduct described herein.

105.    The purpose and effect of Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise Defendants' violations of state and federal law, breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and to conceal adverse information concerning the Company's business, operations, and future prospects.

106.    Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly engage in improper conduct described herein.  Because the Defendants' actions occurred under the authority of the Board, each Defendant was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

107.    Each Defendant aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## VIII.    DERIVATIVE ALLEGATIONS

108.    Plaintiff brings this action derivatively in his own right and for the benefit of the Company to redress injuries suffered, and to be suffered, by Tupperware as a direct result of the breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of the federal securities laws by Defendants.

109.    Tupperware is named as the Nominal Defendant in this case solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

110.    Due to the Board's direct involvement in the wrongdoing, its members' lack of independence, and the substantial likelihood of liability its members face, prosecution of this action independent of the Board is in the best interests of the Company and its stockholders.

## IX.    FUTILITY ALLEGATIONS

111.    Plaintiff incorporates by reference all prior paragraphs as if fully set forth herein.

112.    Tupperware's current Board consists of thirteen members, Defendants Cameron, O'Leary, Bertini, Cloninger, Crofton, Martinez, Riley, Roché, and Szostak, and Non-Parties Hynes, Fernandez, Goudis, and Schnaidman.  Bertini, Martinez, and Roché have announced that they will retire from the Board at the Company's May 20, 2020 annual meeting and, as a result, only ten nominees will sit for the Board election.  Because the size of the Board will be reduced to ten members as of May 20, 2020, the post-annual meeting Board of Cameron, O'Leary, Cloninger, Crofton, Riley, Szostak, Hynes, Fernandez, Goudis, and Schnaidman is the relevant board for the purposes of a demand futility analysis (the "Demand Board").  Plaintiff has not made any demand on the Demand Board to institute this action because such a demand would be a futile and useless act.

### A.    Demand Is Excused as to Fernandez and Goudis Because They Lack Independence

113.    Fernandez falls under the NYSE's "bright-line" independence disqualification. According to the NYSE's Listing Standards, a director is not independent if he or she is, or has been within the last three years, an employee or an executive officer of the listed company. Because Fernandez is Tupperware's current CEO, he may not be considered independent. Accordingly, the Company's 2020 Proxy Statement indicates that Fernandez is not "independent" as defined by the NYSE listing standards.

114.    Goudis also falls under the NYSE's "bright-line" independence disqualification. Because Goudis occupies the corporate executive officer position of

Executive Vice Chairman of the Board, he may not be considered independent.  Accordingly, the Company's 2020 Proxy Statement indicates that Goudis is not "independent" as defined by the NYSE listing standards.

115.    Furthermore, Fernandez and Goudis are not independent because their principal professional occupations are their employment with Tupperware.

116.    As President and CEO beginning on April 6, 2020, Fernandez's compensation includes a starting base salary of $900,000 per year, an annual bonus with a target of 115% of his base salary, and a signing bonus of $500,000.  Upon his hiring, Fernandez was granted Performance Share Units covering 200,000 shares of the Company's common stock and Long-Term Incentive Awards having a grant date value of $1,500,000.  Fernandez may also participate in executive/employee benefit plans and programs of the Company, including relocation benefits and an annual allowance of $20,000 to visit his family in the United Kingdom.

117.    As Executive Vice Chairman beginning on March 12, 2020, Goudis's compensation includes a starting base salary of $500,000 per year and an annual bonus with a target of 75% of his base salary.  Upon being hired, Goudis was granted Performance Share Units covering up to 800,000 shares of the Company's common stock and an option to purchase 1,000,000 shares of Company common stock.  Goudis may also participate in employee benefit plans and programs that are made available to similarly situated executives of the Company, including relocation benefits.

118.    Accordingly, Fernandez and Goudis lack independence from the other members of the Demand Board due to their interest in maintaining their executive positions.  This lack

of independence renders Fernandez and Goudis incapable of impartially considering a demand to commence and vigorously prosecute this action.

**B.    Demand Is Excused as to Cameron, Riley, and Szostak Due to Their Business and Personal Affiliations**

119.    Cameron, Riley, and Szostak are incapable of impartially considering a demand to commence and vigorously prosecute this action due to their long-standing, overlapping business and personal relationships with each other and Defendants Roché, Goings, Monteiro de Castro, and Parker.

**Reynolds American, Inc.**

120.    Cameron, Goings, and Monteiro de Castro have been closely associated going back to their time at Reynolds American, Inc. ("RAI"), a manufacturer of cigarettes and other tobacco products.  Cameron has been the President and CEO of RAI since she returned from her retirement in May 2014, and has been a director of RAI since 2013.  Previously, between August 2004 and February 2011, she had also served as Chairman, President, and CEO.  And prior to that, she was President and CEO of Brown & Williamson Holdings Inc. (formerly known as Brown & Williamson Tobacco Corporation ("B&W")) from 2001 to 2004; a director of B&W from 2000 to 2004; and Chairman of the Board of B&W from January 2003 to 2004.

121.    In July 2004, the U.S. business of British American Tobacco p.l.c. ("BAT") (*i.e.*, Brown & Williamson) was combined with that of R. J. Reynolds Tobacco Holdings, Inc. under the R.J. Reynolds name.  When they combined, R.J. Reynolds became a subsidiary of RAI, with BAT holding a 42% stake.

122.    Goings joined RAI as a director in July 2004 (after serving on its predecessor, R.J. Reynolds Tobacco Holdings, Inc. between June 2002 and July 2004), and he served until February 2007.

123.    Monteiro de Castro also joined the board of RAI in July 2004 and served until December 2008.  Monteiro de Castro retired as COO of BAT on December 31, 2007.  He had held that position since January 2004, having previously served as a director of BAT since March 2002.

124.    Goings, who joined the Tupperware Board in 1996, therefore played a part in Monteiro de Castro's appointment in 2010, and they both facilitated Cameron's appointment in 2011.  The appointment has been particularly lucrative for Cameron who has so far been paid more than $1.9 million for serving on Tupperware's Board.

125.    Given the foregoing mutually beneficial business relationships that have been ongoing for decades, and their affinity for one another, Demand Board member Cameron is incapable of impartially considering a demand to sue Goings or Monteiro de Castro.  Further, there is reasonable doubt that she could impartially consider a demand to sue the remaining Director Defendants because the misconduct undertaken by these individuals is substantially similar to that of Goings and Monteiro de Castro.  Accordingly, any suit against those individuals would necessarily implicate and expose Goings and Monteiro de Castro to liability.

**R. R. Donnelley & Sons Company**

126.    Cameron and Goings also served together as directors of R. R. Donnelley & Sons Company ("RRD").  Goings was an RRD director from 2008 through at least February 2010, while Cameron became an RRD director in January 2009 and served through October

2016.  Thus, Goings facilitated Cameron's appointment to the RRD board in 2009 and the Tupperware Board in 2011.  These directorships have been quite lucrative for Cameron who was paid more than $2.2 million by RRD between 2009 and 2016, and more than $1.9 million by Tupperware since 2011.

127.    Given the foregoing mutually beneficial business relationships that have been ongoing for decades, and their affinity for one another, Demand Board member Cameron is incapable of impartially considering a demand to sue Goings.  Further, there is reasonable doubt that she could impartially consider a demand to sue the remaining Director Defendants because the misconduct undertaken by these individuals is substantially similar to that of Goings.  Accordingly, any suit against those individuals would necessarily implicate and expose Goings to liability.

## SFN Group, Inc. f/k/a Spherion Corporation

128.    Szostak and Parker served together as directors of SFN Group, Inc. f/k/a Spherion Corporation, a strategic workforce solutions company that provided professional services and general staffing.  When Parker joined the board of SFN Group in February 2003, he had already been serving on the Tupperware Board with Szostak for 3 years.  Thereafter, he facilitated Szostak's appointment to the SFN Group board in March 2005, where she served on the board's corporate governance and nominating committees with Parker.  They both served through 2011 when the company was acquired by Randstad Holding NV.  The appointment was lucrative for Szostak who was paid more than $785,000 for serving on SFN Group's Board.

129.    Given the foregoing mutually beneficial business relationships that have been ongoing for decades, and their affinity for one another, Demand Board member Szostak is incapable of impartially considering a demand to sue Parker.  Further, there is reasonable doubt that she could impartially consider a demand to sue the remaining Director Defendants because the misconduct undertaken by these individuals is substantially similar to that of Parker. Accordingly, any suit against those individuals would necessarily implicate and expose Parker to liability.

### Dr. Pepper Snapple Group, Inc.

130.    Szostak and Roché served together as directors of Dr. Pepper Snapple Group, Inc. ("Dr. Pepper").  When Szostak joined the board of Dr. Pepper in May 2008, she had already been serving on the Tupperware Board with Roche for 8 years.  Thereafter, she facilitated Roché being appointed to the Dr. Pepper Board in February 2011, where she served on the board's compensation committee with Szostak.  They served together until May 2017 when Roché did not stand for re-election because she had reached the board's mandatory retirement age.

131.    Given the foregoing mutually beneficial business relationships that have been ongoing for decades, and their affinity for one another, Demand Board member Szostak is incapable of impartially considering a demand to sue Roché.  Further, there is reasonable doubt that she could impartially consider a demand to sue the remaining Director Defendants because the misconduct undertaken by these individuals is substantially similar to that of Roché. Accordingly, any suit against those individuals would necessarily implicate and expose Roché to liability.

**New England Business Service, Inc.**

132.    Szostak and Riley worked together at New England Business Service, Inc. ("NEBS"), a company that designed, produced and distributed business forms, checks, envelopes, labels, greeting cards, signs, stationery, and related printed products.  Riley joined NEBS as a Division President in 1997, and in 1998 was appointed a Senior Vice President.  In August 2002, he became President and COO, after which he was elected as a director in October 2002.  He was appointed CEO on January 1, 2004.

133.    Szostak was appointed as a director in 1998.  Szostak and Riley both left the company in June 2004 when the company was acquired by Deluxe Corporation.  Thereafter, Szostak facilitated Riley's appointment to the Tupperware Board in 2015.  The appointment has been particularly lucrative for Riley who has so far been paid more than $1.1 million for serving on Tupperware's Board.

134.    Given the foregoing mutually beneficial business relationships that have been ongoing for more than a decade, and their affinity for one another, Demand Board members Szostak and Riley are incapable of impartially considering a demand to sue each other. Further, there is reasonable doubt that they could impartially consider a demand to sue the remaining Director Defendants because the misconduct undertaken by those individuals is substantially similar to their own (and each other's) misconduct.  Accordingly, any suit against those individuals would necessarily implicate and expose themselves and each other to liability.

**Boys & Girls Clubs of America**

135.    Szostak and Goings served together for many years on the Boys & Girls Clubs of America's ("BGCA") Board of Governors.  Goings joined the BGCA Board of Governors in 1989.  Szostak joined the BGCA Board of Governors in 1997, a few years before her appointment to the Tupperware Board.  Szostak became the Chairperson of BGCA in 2005 and served through 2006.  Goings was Szostak's immediate successor as Chairperson in 2007.  (Goings had previously served as Chairperson in 1996).  Szostak and Goings currently both have the title of BGCA "Chairperson Emeritus."

136.    Given the foregoing business and personal relationships that have been ongoing for decades, and their affinity for one another, Demand Board member Szostak is incapable of impartially considering a demand to sue Goings.  Further, there is reasonable doubt that she could impartially consider a demand to sue the remaining Director Defendants because the misconduct undertaken by these individuals is substantially similar to that of Goings.  Accordingly, any suit against those individuals would necessarily implicate and expose Goings to liability.

**C.    Demand Is Excused Because Cameron, O'Leary, Cloninger, Crofton, Riley, and Szostak Face a Substantial Likelihood of Liability for Their Misconduct**

137.    Six of the ten members of the Demand Board, Cameron, O'Leary, Cloninger, Crofton, Riley, and Szostak breached their fiduciary duties by, among other things:

     (a)    failing to maintain an adequate system of oversight, accounting controls and procedures, disclosure controls, and other internal controls, which were

necessary to prevent or promptly correct the improper statements made on the Company's behalf;

(b)      themselves affirmatively making, allowing to be made, and/or failing to correct improper statements in Company press releases, SEC filings, and other public statements relating to, among other things, Tupperware's Fuller Mexico division, as well as the Company's business, operations, and prospects.  Each of these directors signed the Company's materially false and misleading February 26, 2019 Form 10-K, for the fiscal year ended December 29, 2018;

(c)      failing to ensure the Company's compliance with relevant legal and regulatory requirements, including but not limited to requirements imposed under state and federal securities laws;

(d)      awarding Tupperware's senior executives lavish compensation packages despite their responsibility for the Company's willful misconduct; and/or

(e)      reappointing the same directors who had failed in their duties to the Audit Committee beginning at the latest in 2019 and continuing to this day.

138.    O'Leary is named as a defendant in the related Securities Class Action which alleges that he violated §§ 10(b) and 20(a) of the Exchange Act by affirmatively making false and misleading statements and/or controlling Tupperware and its § 10(b) violations.  These federal securities violations also constitute breaches of O'Leary's fiduciary duties.

139.    Accordingly, Cameron, O'Leary, Cloninger, Crofton, Riley, and Szostak face a substantial likelihood of liability for their breach of fiduciary duties, making any demand upon them futile.

140.    Three of the ten members of the Demand Board, O'Leary, Riley, and Szostak, as members of the Audit Committee at relevant times, had specifically-defined duties to properly oversee (i) the establishment, maintenance, and monitoring of controls over the Company's financial statements and disclosures, (ii) management of the Company's risk exposure, (iii) the Company's public earnings releases, information, and guidance, and (iv) the Company's compliance with applicable laws and regulations.  Thus, O'Leary, Riley, and Szostak were responsible for knowingly or recklessly allowing and failing to correct the improper conduct and public statements detailed herein.

141.    While all Audit Committee members must be "financially literate" in accordance with SEC requirements and NYSE listing standards, O'Leary, Riley, and Szostak were designated by the Company as meeting the requirements of "Audit Committee Financial Experts" as defined by SEC and NYSE regulations and rules.  This designation means, among other things, that the "expert" has all of the following attributes: (a) an understanding of GAAP and financial statements; (b) an ability to assess the general application of such principles in connection with the accounting for estimates, accruals, and reserves; (c) experience preparing, auditing, analyzing, or evaluating financial statements that present a breadth and level of complexity of accounting issues that are generally comparable to the breadth and complexity of issues that can reasonably be expected to be raised by the registrant's financial statements, or  experience actively supervising one or more persons engaged in such activities; (d) an

understanding of internal controls and procedures for financial reporting; and (e) an understanding of audit committee functions. Because all Audit Committee members were financial experts and/or financially literate, they had a heightened obligation to understand the accounting matters at issue and prevent any and all improper conduct associated therewith.

142. For these reasons, O'Leary, Riley, and Szostak face a substantial likelihood of liability for their breach of fiduciary duties, making any demand upon them futile.

**D.     Demand Is Excused For Additional Reasons**

143. Any suit by the Demand Board to remedy these wrongs would also expose Nominal Defendant Tupperware to liability for violations of the federal securities laws in the pending Securities Class Action and would potentially result in civil actions being filed against one or more of the Director Defendants. If the Board elects for the Company to press forward with its rights of action in this case, then Tupperware's efforts would compromise its own defense of the Securities Class Action.

144. Cameron, O'Leary, Cloninger, Crofton, Riley, and Szostak are likewise conflicted and unable to pursue the Company's claims against the Officer Defendants. Any effort to directly prosecute such claims against the Officer Defendants for their direct roles in the violations of applicable law carried out in Tupperware's name would necessarily expose the Board's own culpability for the very same conduct. In other words, given that the Board was required to be regularly informed concerning the Company's public reporting, outlook, and controls, any effort by the Board to hold the Officer Defendants liable would lead the Officer Defendants to defend on the ground that their own conduct was consistent with corporate policy and practice, as established by and known to the Board.

145.     Moreover, the acts complained of constitute violations of the fiduciary duties owed by Tupperware's officers and directors, and these acts are incapable of ratification. Despite having knowledge of the claims and causes of action raised by Plaintiff, the Board has failed and refused to seek to recover on behalf of the Company for any of the wrongdoing alleged by Plaintiff herein.

146.     Cameron, Cloninger, Crofton, and Riley serve together on the Compensation Committee.  These individuals set at least portions of their own compensation, as well as the compensation of their colleagues on the Demand Board, O'Leary, Szostak, Hynes, Fernandez, Goudis, and Schnaidman.  Their capacity to dole out compensation for themselves and their colleagues makes it impossible for each of them, and any of them, to independently and disinterestedly consider a stockholder demand to investigate or prosecute an action pertaining to Defendants' improper conduct.

## X.    CLAIMS FOR RELIEF

### COUNT I

### Breach of Fiduciary Duties
### (Against the Officer Defendants)

147.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

148.     The Officer Defendants owed fiduciary duties to Tupperware and its stockholders.  By reason of their positions as fiduciaries to the Company, the Officer Defendants owed duties of good faith, loyalty, candor, and truthful disclosure.  The Officer Defendants also owed Tupperware fiduciary duties imposed and defined by the federal securities laws, rules, regulations, and federal substantive corporate law, which impose broad

obligations on Defendants vis-a-vis the corporation and its individual stockholders. In addition, the Officer Defendants have specific fiduciary duties as defined by the Company's corporate governance documents, including its Code of Conduct, and principles that, had they been discharged in accordance with the Officer Defendants' obligations, would have prevented the misconduct and the consequent harm to the Company.

149.     The Officer Defendants violated these fiduciary duties by issuing, causing to be issued, or otherwise allowing the material omissions and misrepresentations described herein. The Officer Defendants were well aware of the relevant disclosure laws, rules, and regulations.

150.     The Officer Defendants consciously breached their fiduciary duties and violated their corporate responsibilities in at least the following ways:

(a)     Affirmatively and repeatedly making and/or failing to correct improper statements in press releases, SEC filings, conference calls, and other public statements, relating to, among other things, Tupperware's business, operations, and growth prospects;

(b)     Failing to ensure the Company's compliance with relevant legal and regulatory requirements, including but not limited to requirements imposed under state and federal securities laws; and/or

(c)     Failing to implement and maintain adequate internal controls.

151.     As a direct and proximate result of the Officer Defendants' breaches of their fiduciary obligations, Tupperware has sustained significant damages. Accordingly, the Officer Defendants are liable to the Company.

152.     Plaintiff, on behalf of Tupperware, has no adequate remedy at law.

## COUNT II

### Breach of Fiduciary Duties
### (Against the Director Defendants)

153.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

154.    The Director Defendants owed and owe Tupperware fiduciary obligations.  By reason of their fiduciary relationships, the Director Defendants specifically owed and owe Tupperware the highest obligation of good faith, fair dealing, loyalty and due care in the administration of the affairs of the Company, including, without limitation, the oversight of the Company's compliance with state and federal securities laws, rules and regulations, as well as the duty of candor and truthful disclosure with respect to their public statements.

155.    The Director Defendants also owed and owe Tupperware fiduciary duties imposed and defined by the federal securities laws, rules, regulations, and federal substantive corporate law, which impose broad obligations on Defendants vis-a-vis the corporation and its individual stockholders.  The Director Defendants violated these fiduciary duties by issuing, causing to be issued, or otherwise allowing the material omissions and misrepresentations described herein.

156.    In addition, the Director Defendants have specific fiduciary duties as defined by the Company's corporate governance documents, including its Code of Conduct and the charters of various Board committees, and principles that, had they been discharged in accordance with the Director Defendants' obligations, would have prevented the misconduct and the consequent harm to the Company.

157.    Each Director Defendant violated his or her fiduciary duties by consciously causing, or consciously failing to prevent the Company from engaging in, the improper acts complained of herein.

158.    The Director Defendants consciously breached their fiduciary duties and violated their corporate responsibilities in at least the following ways:

(a)    Failing to maintain an adequate system of oversight, accounting controls and procedures, disclosure controls, and other internal controls, which were necessary to prevent or promptly correct the improper statements made on the Company's behalf;

(b)    Affirmatively and repeatedly making or allowing to be made, and/or failing to correct, improper statements in Company press releases, SEC filings, and other public statements relating to, among other things, Tupperware's business, operations, and prospects;

(c)    Failing to ensure the Company's compliance with relevant legal and regulatory requirements, including but not limited to requirements imposed under state and federal securities laws;

(d)    Awarding Tupperware's senior executives lavish compensation packages despite their responsibility for the Company's willful misconduct; and

(e)    Reappointing the same directors who had failed in their duties to the Audit Committee beginning at the latest in 2019 and continuing to this day.

159.    As a direct and proximate result of the Director Defendants' breaches of their fiduciary obligations, Tupperware has sustained significant damages.  Accordingly, the Director Defendants are liable to the Company.

160.    Plaintiff, on behalf of Tupperware, has no adequate remedy at law.

## COUNT III

### Unjust Enrichment
### (Against All Defendants)

161.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

162.    By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of Tupperware.  Defendants were unjustly enriched as a result of the compensation and remuneration they received while breaching fiduciary duties owed to the Company.

163.    Plaintiff, as a stockholder and representative of Tupperware, seeks restitution from Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

164.    Plaintiff, on behalf of Tupperware, has no adequate remedy at law.

## COUNT IV

### For Contribution for Violations of § 10(b)
### and § 21D of the Exchange Act
### (Against the Officer Defendants)

165.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

166.    The Officer Defendants are named defendants in the Securities Class Action.

167.    Tupperware is also named as a defendant in the Securities Class Action, which asserts claims under the federal securities laws for, *inter alia*, violations of § 10(b) of the Exchange Act.  If the Company is found liable for violating the federal securities laws, the Company's liability will arise, in whole or in part, from the intentional, knowing, or reckless acts or omissions of the Officer Defendants, as alleged herein.  The Company is entitled to receive contribution from those defendants in connection with the Securities Class Action against the Company.

168.    The Officer Defendants, as directors and/or officers and otherwise, had the power and/or ability to, and did, directly or indirectly, control or influence the Company's affairs, including the content of public statements about Tupperware, and had the power and/or ability, directly or indirectly, to control or influence the specific corporate statements and conduct that violated § 10(b) of the Exchange Act and Rule 10b-5.  Further, the Officer Defendants are liable under § 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

169.    As a result, the Officer Defendants damaged Tupperware and are liable to the Company for contribution.

## XI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Finding that a stockholder demand on the Tupperware Board would have been a futile and useless act;

B.      Finding that Defendants have breached their fiduciary duties to the Company, wasted corporate assets, were unjustly enriched, and violated the federal securities laws;

C.      Directing Tupperware to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote resolutions for amendments to the Company's Bylaws or Articles of Incorporation, and taking such other action as may be necessary to place before stockholders for a vote the following corporate governance proposals or policies:

- a proposal to strengthen the Company's accounting and disclosure controls to ensure that all material information is adequately and timely disclosed to the SEC and the public;

- a proposal to develop and implement procedures for greater stockholder input into the policies and guidelines of the Board; and

- a provision to permit the stockholders of Tupperware to nominate three candidates for election to the Board.

D.      Against each Defendant in favor of Tupperware for the amount of damages sustained by Tupperware, jointly and severally, in an amount to be determined at trial, together with pre- and post-judgment interest at the maximum legal rate allowable by law;

E.      Requiring Defendants to return to Tupperware all compensation and remuneration of whatever kind paid to them by the Company during the time that they were in breach of their fiduciary duties;

F.    Directing Defendants to establish, maintain, and fully fund effective corporate governance and compliance programs to ensure that Tupperware's directors, officers, and employees do not engage in wrongful or illegal practices;

G.    Granting additional appropriate equitable and/or injunctive relief to remedy Defendants' misconduct, as permitted by law;

H.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees and expenses; and

I.    Granting such other and further relief as this Court deems just and equitable.

## XII.  DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury as to all issues so triable.

Dated:  May 18, 2020

ROBBINS GELLER RUDMAN
& DOWD LLP

By:   *s/Jack Reise*
JACK REISE
Bar No. 58149
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: (561) 750-3000
Facsimile: (561) 750-3364
jreise@rgrdlaw.com

Trial Counsel

TRAVIS E. DOWNS III
BENNY C. GOODMAN III
ERIK W. LUEDEKE
655 West Broadway, Suite 1900
San Diego, CA 92101
Phone: (619) 231-1058
Fax: (619) 231-7423
TravisD@rgrdlaw.com
BennyG@rgrdlaw.com
EluedekE@rgrdlaw.com

**JOHNSON FISTEL, LLP**
MICHAEL I. FISTEL, JR.
40 Powder Springs Street
Marietta, GA 30064
Telephone: (470) 632-6000
Facsimile: (770) 200-3101
MichaelF@johnsonfistel.com

*Attorneys for Plaintiff*